**Joseph BARROWS and Sylvia Barrows, Plaintiffs-Appellants,**

**v.**

**FOREST LABORATORIES, INC., Forest-Barrows Inc., Hans Lowey, Ian Stewart, Roberto Sein, Milton Dorison, William J. Candee, III, Howard Solomon, M.D. Oppenheim & Co., Defendants-Appellees.**

**No. 1194, Docket 84–7094.**

United States Court of Appeals, Second Circuit.

Argued May 11, 1984.
Decided Aug. 6, 1984.

Richard F. Horowitz, Heller, Horowitz & Feit, P.C., New York City (Ira Kleiman, on brief), for plaintiffs-appellants.

Dale A. Schreiber, Schwartz, Klink & Schreiber, P.C., New York City, for defendants-appellees.

Before FEINBERG, Chief Judge, WINTER, Circuit Judge, and LASKER, District Judge.*

LASKER, District Judge:

Joseph and Sylvia Barrows appeal from the dismissal of their complaint alleging violations of federal securities laws and New York statutory and common law by Forest Laboratories, Inc. ("Forest"), Forest-Barrows, Inc., M.D. Oppenheim & Co., and various Forest officers, directors, and employees, in connection with Forest's purchase of the Barrows' pharmaceutical business in 1969. Following the denial of a motion for leave to amend the complaint, the court granted summary judgment dismissing the complaint on the ground that the Barrows concededly had sustained no loss under the measure of damages held applicable to their claims by the district court. We conclude that the district court neither abused its discretion nor erred as a matter of law in denying leave to amend, and accordingly affirm.

* Hon. Morris E. Lasker, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

## I.

In 1969, appellants sold their pharmaceutical manufacturing business to Forest in exchange for 22,000 shares of Forest common stock, which was then being traded at $25 per share. Under the sale agreement, dated April 1, 1969 (the "Agreement"), appellants' pharmaceutical business was valued at $550,000. The Agreement contained a somewhat complicated mechanism under which the number of shares received by the appellants could be adjusted based on a rise or fall in the market value of the stock within two years after the date of the Agreement. As a result of this clause, appellants eventually received between 9,000 and 13,000 additional shares.[1]

In 1977, Forest publicly disclosed that, from about 1963 to 1974, Forest officers had engaged in a scheme to misstate Forest's financial condition and earnings. The Barrows, who had continued to hold most of their Forest stock, filed this action in 1978, alleging that as a result of the admitted misstatement the stock they received for the sale of their business was worth substantially less than its represented value. They alleged violations by the appellees of Section 17(a) of the Securities Act of 1933 ("1933 Act") (15 U.S.C. § 77q(a) (1982)), Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b) (1982) ("1934 Act") and Rule 10b–5 promulgated thereunder, and various provisions of New York law. Appellants sought recission of the 1969 Agreement or, in the alternative, $550,000 plus interest. They also claimed $10,000,000 in punitive damages.[2]

Beginning in 1980, Forest, then under new management, began showing substantial earnings improvements, and the price of Forest stock rose sharply. Between January and August 1980, appellants sold all of their remaining shares, receiving a total of $748,229.30.[3] As appellants concede, the proceeds from the sale of the stock exceed the amount claimed as compensatory damages in their original complaint.

Following the sale of their stock, and two and one-half years after the filing of the original complaint, the Barrows moved to amend their complaint to add new theories of relief. The first of these claims (proposed fifth cause of action) asserted that, at the time the Barrows sold their business, the market price of Forest stock was grossly inflated as a result of the fraud perpetrated by appellees; that the stock was then actually worth no more than $1.50 per share, instead of the $25 per share at which it was being traded; and that the Barrows were therefore entitled to 335,355 additional shares—that is the number of shares that would have been necessary to pay the Barrows $550,000 if the stock, at the time of the sale of their business, had been valued at its "true" value of $1.50 per share.

The second new claim for relief (proposed sixth cause of action) asserted that because the Barrows were fraudulently induced to accept stock having a value of no more than $46,966.50, appellees had been unjustly enriched in the sum of $503,034.50 (plus interest from the date of the Agreement).

The district court denied appellants' motion to amend the complaint.[4] It ruled that the two new claims would significantly expand the scope of discovery and result in an unwarranted windfall for appellants should they prevail. The court noted that in the proposed fifth cause of action the Barrows were seeking to be awarded near-

---

1. The exact number of additional shares received is a matter of dispute among the parties. The Barrows contend that they received 9,311 additional shares; appellees contend that the Barrows received 12,177 additional shares including stock dividends. The dispute is not material to this appeal.

2. Several shareholder class action suits against Forest, based on the misstatement of Forest's financial condition, were litigated before Judge Motley and eventually resulted in a settlement. Appellants opted out of those actions.

3. Joint Appendix ("J.A.") 1568.

4. Memorandum and Order of May 19, 1981 (J.A. 379–386).

ly 30 percent of Forest's stock, which would have made them, together, the company's single largest stockholder. Under the Agreement, by contrast, the Barrows were to have received what amounted to no more than 4.43 percent of Forest's stock in return for the sale of their business. The court concluded that a determination whether the parties would have entered into any agreement if the stock's alleged true value of $1.50 had been publicly disclosed at the time of the sale would require undue speculation. As to the proposed sixth cause of action, the court held that because the Barrows "could have sold the Forest Laboratories stock they received at the closing for precisely the value assigned to it in the Agreement,"[5] they had no basis for claiming that the appellees had been unjustly enriched.

Six weeks after the district court's decision, the Barrows moved for reargument. The court then determined that, rather than attempting to "clarify" its decision, the court would "rescind" it and instead declare the measure of compensatory damages it would allow if appellants were to prevail:

> "they will receive (in addition to any punitive damages that may be allowed) any difference between the value at the time of the business they sold (plus interest at legal rates to and including the date on which they sold their stock) less the proceeds of such sale. They will further be entitled to prejudgment interest from the date of the sale on such difference, if any."[6]

Following this decision, the parties attempted to proceed with discovery. Because the Barrows refused to cooperate fully, the district court entered a partial preclusion order against them as to the tax basis for the Forest shares they received under the Agreement. As a result of the preclusion order and the court's earlier decision specifying the measure of damages that would be allowed, appellees moved for summary judgment on the ground that the Barrows had suffered no compensable damages. The Barrows consented to entry of summary judgment on that basis. This appeal followed.

## II.

Appellants contend that the district court erred as a matter of law in restricting them to damages based on the difference between the value of their business and the proceeds of the sale of their Forest stock.[7] They argue that their claim for benefit-of-the-bargain damages (*i.e.*, damages for the difference between the value of what was bargained for and the value at the time of what was received), far from demanding a windfall, merely seeks recovery of the amount appellants would have received had the market for Forest shares not been "rigged" by the appellees' fraud. Appellants rely primarily upon this Court's decision in *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir.1981), which held that benefit-of-the-bargain damages are available to defrauded shareholders in a tender offer/merger situation when the acquiring company misrepresents the value of the consideration to be received by the shareholders of the target company. Appellants further contend that the district court erred in ruling on the merits of their theories of relief in the absence of a fully developed factual record.

Appellees respond that the district court's denial of the motion for leave to amend constituted an appropriate exercise of discretion in view of the increased scope

---

5. *Id.*, pp. 6–7 (J.A. 384–385).

6. Memorandum and Order of September 25, 1981, p. 2 (J.A. 642).

7. Although the parties have referred to the damages permitted by the district court as "out-of-pocket" damages, in fact they are more correctly characterized as "gross economic loss" (also referred to as recissionary damages), since they are based on the difference between the price paid and the price received on resale, rather than on the excess of the purchase price over the actual value of the stock. *See generally Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 603–604 (2d Cir.1978) (recissionary damages); *Tucker v. Arthur Andersen & Co.*, 67 F.R.D. 468, 482 (S.D.N.Y.1975) (out-of-pocket damages).

of discovery that would have resulted from granting the amendment, the extravagant and potentially coercive size of the recovery that was sought under the appellants' new theories, and the timing of the motion—two and one-half years after the filing of the complaint. On the merits, appellees argue that the general rule in this Circuit does not permit benefit-of-the-bargain damages to defrauded purchasers of securities, and that the holding of *Osofsky v. Zipf, supra,* is applicable only in the specialized case of tender offers or mergers, and then only when the award of such damages does not require undue speculation as to the extent of the plaintiff's losses.

## A. Standard of Review

Appellants contend that the court below decided a purely legal issue in ruling on the permissible measure of damages, while the appellees frame the issue as being whether the court abused its discretion in denying leave to amend the complaint. We read the district court's decision as relying jointly on the court's discretionary authority under Fed.R.Civ.P. 15(a) and on its view of the legal merits of appellants' proposed new theories of relief. Although the court did not expressly refer to the standards applicable to motions under Rule 15(a), its decisions both on the original motion and the motion for reargument discuss considerations of undue delay, bad faith, and prejudice to the opposing party—all touchstones of a district court's discretionary authority to deny leave to amend.[8] Thus, the court noted that the claims "could significantly expand the scope of discovery at a time when the case should be ready to proceed to trial,"[9] and that they created "an immi-

nent danger that plaintiff would seek to force a favorable settlement by abusive use of the discovery process."[10] The court's denial of leave to amend based on such conclusions may be overturned only if it constitutes an abuse of discretion. *See Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 81 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 637 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). Nevertheless, although the district court, as discussed below, had ample justification for precluding the amendment on these grounds alone, the court went on to express its views as to the merits of appellants' new claims as well. Accordingly, we also comment briefly below on the legal merits of appellants' theories of recovery.

## B. Discussion

■ The district court acted well within its discretion in concluding that appellants' new claims would unfairly prejudice appellees by substantially altering the complaint's theories of relief and delaying the trial of the case. Appellants' new claims represented a radical shift from the recovery sought in the original complaint. Instead of demanding recission of the Agreement, the new claims sought what appellees have aptly characterized as a form of specific performance—*i.e.,* enforcement of the Agreement in accordance with the alleged true market value of the Forest stock at the time of the sale. In view of the fact that substantial discovery had already been completed, it was certainly reasonable, two and one-half years after the complaint had been filed, to deny such a recasting of the complaint's theories of relief.[11] Furthermore, the recovery sought by appellants—

---

**8.** *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (leave to amend may be denied based on "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

**9.** Memorandum and Order of May 19, 1981, pp. 1–2 (J.A. 379–80).

**10.** Memorandum and Order of September 25, 1981, p. 2 (J.A. 642).

**11.** Appellants have identified no reason, apart from the sale of their Forest stock in 1980, why their new theories could not have been advanced at an earlier point in the litigation or, indeed, in the original complaint. Although the sale of their stock explains why their original theories of relief were no longer viable, it does not explain why the new theories could not have

shares worth close to $14 million and comprising nearly 30 percent of Forest's stock—can only be characterized as a windfall in relation to the value of the business they sold. The court was justified in taking into account the unfairness to appellees of suddenly transforming a lawsuit for recission into a battle for such high stakes.

Moreover, appellants' contention that their new claims would not have expanded the scope of discovery defies common sense. At the very least, the new causes of action would have required a determination of the "true" market value of the Forest stock absent appellees' fraud, both in 1969 when the Agreement was executed and in 1971 when the appellants received additional shares under the Agreement's provision for adjustments based on changes in the market value of the stock. Although the proposed amended complaint set the 1969 value at $1.50 per share, appellants themselves argued below that this figure conceivably might be $3.05, $11.00, "or any other value from a low of $1.50 to the high of $11.00." [12] Thus, contrary to appellants' contentions here, the discovery necessary to prove the precise "real" market value of the Forest stock in support of a benefit-of-the-bargain claim clearly would have been different from, and much more detailed than, the discovery necessary to prove that recission was warranted because the value of the stock was inflated in some degree.

As to the merits of their proposed claim for benefit-of-the-bargain damages, appellants' reliance on *Osofsky v. Zipf, supra,* is misplaced. *Osofsky* held that shareholders of a target company who were promised a stock package worth $62.50 in exchange for their shares, but who received a package which was trading at $59.88 on the effective date of the merger, were entitled to recover the difference between the promised value and the actual value of the stock. The court held that, in such a case, benefit-of-the-bargain damages can be computed with certainty, and therefore are not prohibited by section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) (1982), which forbids recovery of "a total amount in excess of ... actual damages." [13] The *Osofsky* court discussed earlier cases which had held benefit-of-the-bargain damages unavailable to defrauded purchasers of securities,[14] but the court read those cases as refusing to allow such damages only where their determination is unduly speculative. The *Osofsky* panel also noted that misrepresentations made in the course of a tender offer contest present a particularly compelling case for allowing benefit-of-the-bargain damages, because the price paid by a successful offeror often exceeds the fair market value of the securities tendered by the shareholders, and defrauded shareholders therefore would rarely be entitled to any compensation if they could recover only out-of-pocket damages. The court summarized its holding by stating that benefit-of-the-bargain damages should be available in

> the limited situation involved in this case, where misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger. But, of course, giving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasonable certainty.

645 F.2d at 114.

■ Here, unlike *Osofsky*, the benefit-of-the-bargain damages claimed by appellants

---

been presented in the original complaint as alternatives to their claim for recission.

**12.** Affidavit of Richard F. Horowitz in Support of Motion for Reargument of Motion for Leave to Amend the Complaint, dated June 30, 1981, § 13 (J.A. 399).

**13.** Section 28(a) of the 1934 Act states in part: The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

**14.** *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *Levine v. Seilon, Inc.,* 439 F.2d 328 (2d Cir.1971).

cannot easily be determined by a comparison of the promised value of the stock with its actual market value on the effective date of the transaction. Instead, appellants' proposed claim is based on the value the stock purportedly would have had if Forest's true financial condition had been publicly known at the time of the transaction, clearly a speculative proposition. Equally speculative is the question whether the parties would have reached any agreement if Forest's true financial condition had been known, particularly one in which appellants would have received 30 percent of Forest's stock. A claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what the parties would have done if the circumstances surrounding their transaction had been different.

■ Appellants' repeated assertion that they were entitled to proceed on the assumption of an unrigged securities market in consummating the 1969 Agreement is beside the point. The holding of *Osofsky*, upon which appellants rely, does not turn on the distinction between a "rigged" and an "unrigged" market, but on the distinction between damages that are speculative and those which are certain. The issue is not whether appellants were entitled to assume that the market price of the Forest stock in 1969 reflected Forest's true financial condition, but instead whether they have suffered legally compensable damages as a result of the fact that it did not. Because, in the circumstances presented here, appellants' proposed claim for benefit-of-the-bargain damages is unduly speculative and would result in a windfall unrelated to the value of the business they sold, the district court did not err in refusing to permit the amendment.[15]

Appellants take particular issue with the district court's discussion of their proposed sixth cause of action (for unjust enrichment), which the court rejected in part because of its view that the true value of the stock was "what one can get for it on the open market," and that appellants "apparently could have sold the Forest Laboratories stock they received at the closing for precisely the value assigned to it in the Agreement."[16] In fact, appellants argue, the stock they received was unregistered and the Agreement prohibited them from conveying the stock until the stock was registered or until they received a no-action letter from the SEC. Appellants were unable to obtain a no-action letter until 1974, when the stock was trading at between $2 and $3 per share, and they contend accordingly that the court erred in stating that they could have sold the stock for precisely the value it was represented to have.

Although the district court appears not to have taken note of this restriction on appellants' ability to sell their stock, we perceive no basis for concluding that the existence *vel non* of such restrictions makes any difference as to the merits of appellants' claim. The Agreement prohibited them from selling the stock, unless the specified conditions were met, regardless of the price at which the stock was being traded, and regardless whether the "true" value of the stock was $1.50, $25, or $100. Although the market price of the stock was severely depressed at the time when appellants first became free to sell their stock in 1974, and they would have sustained a substantial loss had they sold at that time, the district court's formula of damages would have permitted appellants to recoup that loss if they were successful in the suit. Thus, the existence of restrictions on conveyance of the stock appears to have been a neutral factor. In any event, the proposed sixth cause of action, like the fifth,

15. Appellants' contention that the court erred in ruling on the merits of their theories of relief prior to the development of a full factual record is unpersuasive. Although there may be circumstances in which such factual development is advisable prior to a ruling, *see Voege v. Ackerman,* 364 F.Supp. 72, 73 (S.D.N.Y.1973), appel-

lants have not explained how or why such a procedure would have shed light on the legal merits of their claims in this case.

16. Memorandum and Order of May 19, 1981, pp. 6–7 (J.A. 384–85).

seeks an unjustifiable windfall which would give appellants $503,000 in cash, plus prejudgment interest from 1969 to 1980, on top of the nearly $750,000 they have already received for the sale of their stock, all in exchange for a business valued at $550,000 under the terms of the parties' agreement.

The judgment of the district court is affirmed.