**NORWOOD VENTURE CORP., Plaintiff,**

**v.**

**CONVERSE INCORPORATED, Apollo Investment Fund, L.P., Appollo Capital Management Inc., as General Partner of Apollo Advisors, L.P., Lion Advisors, L.P., Lion Capital Management Inc., as General Partner of Lion Advisors, L.P., Gilbert Ford, Michael C. Bell, Donald J. Camacho, Leon D. Black, Michael S. Gross, Joshua J. Harris, and Jack A. Green, Defendants.**

**No. 96 Civil 3713(HB).**

United States District Court,
S.D. New York.

April 3, 1997.

206

Jean Reed Haynes, Bonnie J. Host, Jonathan F. Putnam, Dani R. James, Kirkland & Ellis, New York City, for Plaintiff.

Bruce S. Kaplan, Eric Seiler, Robert J. Lack, Ellen Bresler, Robert S. Loigman, Friedman & Kaplan, L.L.P., New York City, for Defendants.

## OPINION AND ORDER

BAER, District Judge.

Plaintiff brought this cause of action against defendants after a business deal between the two soured. Defendants now move to dismiss plaintiff's claims. Defendants' motion is granted; while plaintiff sufficiently pleads scienter, it failed to adequately plead loss causation. Supplemental jurisdiction is declined and plaintiff's state law claims are also dismissed.

### I. Background

This cause of action arises out of the sale of Apex One ("Apex") to Converse on May 18, 1995. Apex was a sports apparel company that suffered from continuous cash flow problems. After attempting to raise capital through two private placements in which Prudential Equity Investors III, L.P., Dominion Income Management Corp., Norwood Venture Corp. ("Norwood"), Exeter Venture Lenders, L.P. and Bessemer Venture Partners Apex One [1] invested in Apex, Apex still lacked the capital to timely produce products for its trade cycle in 1993 and 1994. Consequently, Apex's Board of Directors decided to sell the company by early 1995. Shortly

---

1. All of these parties (with the exception of Norwood) were originally plaintiffs in this action, but settled with defendants after this motion was fully briefed and argued before the Court. These parties will be referred herein as the "former plaintiffs." The remaining parties to the cause of action have requested that Converse's motion to dismiss be decided with respect to Norwood.

thereafter, Bear Steams & Co., Inc. ("Bear Steams") acting on behalf of Apex, contacted Apollo [2] which had expressed an earlier interest in a Converse/Apex transaction, and confirmed that Converse would be interested in acquiring Apex.

During the course of negotiations, Apex made it clear to defendants that Apex's most important consideration was the need for adequate funding on an immediate and ongoing basis to ensure Apex's 1995 trade cycle including, among other things, $6 million to pay Apex creditors. Defendants assured Apex that they could and would provide Apex with this funding. The final transaction, which closed on April 28, 1995, provided that Converse would purchase the former plaintiffs' as well as Norwood's Apex securities in exchange for Converse notes, warrants and other consideration (the "Securities Purchase Agreement" or "SPA"). Some parties received both notes and warrants; Norwood, however, received only notes.

After the closing, Apex discovered that defendants Apollo and Converse planned a bond issue later that June in order to finance the purchase of Apex's securities. However, the bond issue never got off the ground after Converse reported first that its earnings for the second quarter of 1995 would be "flat" in comparison to the second quarter earnings of 1994, and then subsequently announced that it would actually lose $6 to $8 million in the second quarter of 1995.

In mid- to late- July, Converse and Apollo representatives met to implement a reverse integration plan of Apex and Converse, and according to plaintiff "schemed methodically to circumvent bankruptcy laws that could have prevented the rape of Apex's assets." Comp. ¶ 92. On August 4, 1995, defendant Joshua J. Harris,[3] without knowledge of any Apex executive, ordered several dozen trac-

tor trailers to Apex's warehouses in New Jersey to remove over $10 million worth of inventory housed there. On September 14, 1995, Apex filed for bankruptcy protection.

On November 18, 1995, the date Norwood's first interest payment on the notes was due, Converse defaulted and notified the former plaintiffs and Norwood of claims against them for contractual indemnification based on breaches of representations and warranties contained in the SPA, and that it planned to set off those claims against the interest payments due under the notes. The former plaintiffs and Norwood responded on February 6, 1996 by commencing an action against Converse in New York state court seeking a declaration that Converse had no valid claim for indemnification or right of setoff. Converse counterclaimed for indemnification and asserted a fraud claim against Prudential and Michael Lewis.[4]

On May 17, 1996, the parties commenced two separate actions in this Court. In the instant case, Norwood alleges that in connection with Converse's purchase of its Apex securities, each of the defendants, either directly or as a control person, violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, and that the defendants (except for Leon D. Black and Jack A. Green) committed common law fraud and deceit, and negligent misrepresentation.

For the reasons stated below, Converse's motion to dismiss the federal securities fraud claim is granted and plaintiff's common law claims are dismissed without prejudice.

## II. *Discussion*

### A. *Standard of Review*

A motion to dismiss may be granted where it "appears beyond doubt that there are no

---

2. Defendants Apollo Investment Fund, L.P., Apollo Advisors, L.P., and Lion Advisors, L.P. controlled in excess of 67% of the outstanding common stock of Converse Incorporated ("Converse"). Comp. ¶ 27.

3. Mr. Harris is identified in the complaint as a party "affiliated with Apollo." Comp. ¶ 38. He was, at all relevant times, a member of the Board of Directors of Converse, and along with others, "took principal responsibility on behalf of Apollo

and Converse for the acquisition of Apex, the integration of Apex's operations into those of Converse, and the subsequent efforts by Apollo and Converse to separate the two businesses." *Id.*

4. Michael Lewis was the co-founder of the predecessor company to Apex One. The state case was resolved by a jury verdict in favor of Converse on January 31, 1997.

set of facts in support of plaintiff's claim which would entitle plaintiff to relief." *Harsco Corp. v. Segui,* 91 F.3d 337, 341 (2d Cir.1996). In reviewing such a motion, the court must take the plaintiff's allegations as true. *Id.*

## B. Violation of § 10(b) of the 1934 Act and Rule 10b–5

### 1. Scienter Under the Private Securities Litigation Reform Act

■ Defendants argue that plaintiff's securities fraud claim must be dismissed because plaintiff does not sufficiently plead scienter under the heightened pleading standard requirements of the Private Securities Litigation Reform Act ("PSLRA"). Plaintiff argues that the PSLRA adopted the Second Circuit's scienter pleading standard, and that plaintiff has adequately plead scienter because it has alleged circumstantial evidence of defendants' conscious or reckless behavior, and that defendants had the motive and opportunity to defraud it.

■ It appears that the standard for pleading scienter in private securities cases in light of the Private Securities Litigation Reform Act of 1995 ("PSLRA") is an issue of first impression in this circuit. Prior to the passage of the PSLRA, a plaintiff in the Second Circuit was required to allege specific facts that either (1) constituted circumstantial evidence of either reckless or conscious behavior on the part of the defendant or (2) established defendant's motive to commit fraud and an opportunity to do so. *See In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.1993). However, in passing the PSLRA, Congress sought to "strengthen existing pleading requirements," and stated that "it [did] not intend to codify the Second Circuit's case law interpreting this pleading standard."[5] H.R.Conf.Rep. 104–369, 104th Cong. 1st Sess. 41 (1995). Moreover, when he vetoed the PSLRA bill, a veto that Congress overrode, President Clinton stated that it was "crystal clear" that Congress intended the PSLRA "to raise the [pleading] standard even beyond the [high pleading standard of the Second Circuit]." 141 Cong.Rec. H15215–06 (1995). Therefore, under the PSLRA a plaintiff in a private securities litigation action must now plead specific facts that "create a strong inference of knowing misrepresentation on the part of the defendants." *In re Silicon Graphics, Inc. Securities Litigation,* 1996 WL 664639, *7 (Sept. 25, 1996); *see also Friedberg v. Discreet Logic Inc.,* 1997 WL 109228 (D.Mass. March 7, 1997) (holding that the PSLRA pleading standard was intended to be stronger than the existing Second Circuit standard). *But see Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246 (N.D.Ill.1997) (holding that although the PSLRA does not bind the courts to the Second Circuit's pleading standard, the court would still apply it); *Marksman Partners L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1310 (C.D.Cal.1996) (holding that the "motive and opportunity" test of the Second Circuit was not discarded by the passage of the PSLRA); *Sloane Overseas Fund, Ltd. v. Sapiens Internat'l Corp., N.V.,* 941 F.Supp. 1369, 1377 (S.D.N.Y.1996) (citing PSLRA and parenthetically noting it codified the Second Circuit standard for pleading scienter).

While there is precious little guidance with respect to what will satisfy the PSLRA knowing misrepresentation standard, it is instructive to look at the first prong of the Second Circuit's standard noted above.[6] *See Friedberg,* 1997 WL 109228 at *9 (finding that the PSLRA did not codify the Second Circuit's motive, opportunity and recklessness standard, but did not specifically reject the application of the Second Circuit's "conscious misbehavior" standard). Under this standard, the scienter requirement requires a plaintiff to allege "circumstances indicating conscious behavior by defendants." *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). A plaintiff cannot simply couple a factual statement with a conclusory allegation of fraudulent intent to adequately plead scienter.

---

5. The Report, in a footnote, explained "[f]or this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." *Id.* at 41, n. 23.

6. *See* note 4, *supra.* The Report did not reject the applicability of the Second Circuit's "conscious behavior" pleading standard.

*Acito v. IMCERA Group,* 47 F.3d 47, 53 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). Nor is it sufficient to simply allege statements of a prosperous future compared to a bleaker reality. *Acito,* 47 F.3d at 53. "[M]isguided optimism is not a cause of action, and does not support an inference of fraud." *Id.*

Defendants argue that plaintiff's federal securities fraud claim must be dismissed for failure to state a claim since the complaint is devoid of any facts that give rise to a strong inference that when defendants promised to fund Apex on an immediate and ongoing basis the promise was false. Defendants argue that Norwood does not allege that defendants ever represented that Apex would be funded from Apollo's or Converse's cash reserves, nor does Norwood allege that defendants knew that the bond offering would not be able to proceed at the time they made the promise of funding.

I find that Plaintiff, while a close question due to the paucity of precedent, has sufficiently alleged specific facts which create a strong inference of knowing misrepresentation on the part of the defendants. For example, plaintiff alleges that defendants repeatedly represented that they would provide Apex with adequate funding on an immediate and ongoing basis. Comp. ¶¶ 57, 64. Plaintiff alleges that not later than the closing of the transaction, defendants knew they planned to float a bond issue in late June, had retained BT Securities to assist them and that the funding of Apex was contingent on the success of the issue, and yet failed to disclose these facts to plaintiff. Comp. ¶¶ 83–84. Lastly, plaintiff alleges that even if the June bond issue had been successfully floated, the funds produced in July and August would have been too late to finance plaintiff's fall 1995 trade cycle. Comp. ¶ 84. These allegations create a strong inference that, before and at the time of closing, defendants promised immediate funding knowing that such funding would not occur until at least one month after the transaction closed. These statements are more than factual allegations coupled with a conclusion of fraudulent intent. Therefore, plaintiff has sufficiently plead scienter under Section 10(b)

and Rule 10b–5 interpreted in light of the PSLRA.

2. Loss Causation

■ The Court's inquiry, however, cannot end there. Defendants argue that even if Norwood sufficiently plead scienter, its federal securities fraud claim fails because it cannot sufficiently allege loss causation. In an action for federal securities laws violations, a plaintiff must adequately plead loss causation. *See* 15 U.S.C. § 78u–4(b)(4) (West Supp.1996). To establish loss causation, a plaintiff must allege both "that the misrepresentation induced it to enter into the transaction and that the misrepresentation was the cause of the actual loss suffered." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). The latter requires a plaintiff to show that the economic harm it suffered occurred as a result of the alleged misrepresentation. *Id.*

As noted above, Norwood received only Converse debt instruments in connection with its sale of Apex securities. Defendants argue that Converse's obligation to pay the notes could not be affected by the alleged fraud or subsequent bankruptcy of Apex or decline of Converse's stock, and therefore Norwood can allege no economic loss suffered. Plaintiff alleges it was damaged because, had it known about defendants' fraud, it would have pursued other options, such as selling Apex to another interested company or putting Apex into bankruptcy sooner. Comp. ¶¶ 65–66.

Norwood has failed to adequately allege the causation requirements of the statute. While, plaintiff alleges that the defendants' misrepresentations induced them to enter into the transaction, it fails to allege how it suffered a loss as a result of the alleged misrepresentation. The complaint states that Converse's stock price has dropped and that as a "security holder of Converse, the [plaintiff was] directly damaged by [defendants'] fraudulent acts." Comp. ¶ 14. However, Norwood is not an equity security holder, but simply a holder of Converse debt. In fact, as defendants point out, absent a threat to Converse's solvency (which was not alleged), a decrease in Converse's stock price

cannot render Norwood's debt less likely to be paid. Faced with this fact, plaintiff merely claims with respect to damages it is "reasonable to assume" that because Converse's stock price had dropped, which parenthetically hasn't happened either,[7] the value of the notes has also declined. Pl. Memorandum p. 10. This allegation, however, falls short of showing actual loss suffered. *Id.* Therefore, because Norwood cannot prove actual loss causation, defendants' motion to dismiss Norwood's federal securities fraud claim is granted.[8]

### III. *Conclusion*

For the reasons stated above, defendant's motion to dismiss plaintiff's federal securities fraud claim is GRANTED, supplemental jurisdiction is declined, and plaintiff's state law claims are dismissed. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

---

7. While Converse common stock closed at $9 per share on April 28, 1995 (the day the SPA was executed) and closed at $6⅝ on September 3, 1996 (the day plaintiff filed its memorandum in opposition to defendants' motion to dismiss), the stock closed at $16½ on January 6, 1997 and $17⅞ on April 1, 1997.

8. Furthermore, it appears that Norwood claims damages based on the difference between what they received and what they would have received had there been no fraud ("benefit of the bargain"

damages). Pl. Memorandum p. 10. However, benefit of the bargain damages are awarded only where the amount of damages can be computed with certainty. *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 59 (2d Cir.1984). Damages cannot be computed with certainty where, as here, plaintiff's damages theory is based on a bargain "whose terms must be supplied by hypotheses what the parties would have done if the circumstances surrounding their transaction had been different." *Id.*